IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| GLORIA JEAN EDWARDS, | ) | Civil Action No. 3:12-693–RMG-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN,[1] ACTING | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on September 22, 2005 (protective filing date of September 14, 2005), alleging disability as of July 24, 2001. See Tr. 12, 86. Plaintiff's claim was denied initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on January 13, 2009, at which Plaintiff and a vocational expert ("VE") appeared and testified. On March 18, 2009, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled because she was able to perform her past relevant work as a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this lawsuit.

hospital secretary. Tr. 12-19. The Appeals Council upheld the decision on November 21, 2009. Tr. 1-3. Plaintiff thereafter filed an action in United States District Court and, in an order entered January 24, 2011, the decision was reversed and remanded to the Commissioner for further proceedings.

After remand, the ALJ held a second hearing on December 20, 2011, at which the Plaintiff and a VE appeared and testified. Tr. 640. The ALJ issued a decision on January 6, 2012, denying benefits and finding that Plaintiff was not disabled because she was able to perform her past relevant work as a secretary.

Plaintiff was fifty-eight years old at the time she was last insured for DIB benefits. She has a high school education and past relevant work as a secretary and unit clerk in a hospital. Plaintiff alleges disability due to lupus, rheumatoid arthritis, and degenerative disc disease ("DDD"). See Tr. 642, 759.

The ALJ found (Tr. 642-648):

1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2.      The claimant did not engage in substantial gainful activity during the period from July 15, 2003 through her date last insured of December 31, 2006 (20 CFR 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairments: rheumatoid arthritis, degenerative disc disease, and lupus (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity

2

to: sit for 6 hours of an 8-hour day; stand/walk for 2 hours of an 8-hour day; frequently lift/carry light items; occasionally lift 10 pounds; never climb, crawl, be exposed to hazards, or perform overhead reaching; occasionally crouch and stoop; and frequently perform fine fingering and handling.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a secretary (D.O.T. #201.362-030). This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from July 15, 2003 through December 31, 2006, the date last insured (20 CFR 404.1520(f)).

Plaintiff filed the current action in the United States District Court on March 9, 2012.

## STANDARD OF REVIEW

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

## MEDICAL EVIDENCE

Plaintiff was evaluated by Dr. Arthur C. Hutson of the Medical University of South Carolina ("MUSC") on August 2, 2000, for uncontrolled hypertension with feelings of weakness, at times associated with sweating and rapid heartbeat. Tr. 289-290. His assessment was that Plaintiff's blood pressure was not completely controlled as episodes were occurring twice daily suggesting some type

3

of sympathetic response. In an August 29, 2000 follow-up visit, MUSC Nurse Practitioner ("NP") Roger Mallin saw Plaintiff in a follow up on August 29, 2000, and noted sharp non-exertional chest pain. Examination was essentially unremarkable, and Plaintiff was assessed with musculoskeletal chest pain for which Lortab was prescribed. Tr. 291.

On September 5, 2000, Plaintiff reported to NP Susan Barber that she experienced chest pain when moving that was somewhat relieved by Lortab, felt fatigued, and became short of breath with minimal exertion. Tr. 292-293. NP Barber assessed Plaintiff with tachycardia and diaphoresis and suspected possible autonomic symptoms, but noted that Plaintiff denied anxiety or stress. Tr. 292-293.

Dr. Airody Kesh Hebbar of MUSC Family Medicine evaluated Plaintiff on September 12, 2000, noting she was recently treated for community acquired pneumonia after complaints of unexplained tachycardia, she continued to be mildly breathless on exertion, and she continued to have resting tachycardia. He assessed Plaintiff with palpitations and mild hypertension and prescribed Atenolol. Tr. 294. On October 18, 2000, NP Barber noted that Plaintiff had a recurrence and worsening of chest pain that could possibly be pleurisy. Exam revealed better control of her heart rate and a very faint end inspiratory rub in the area of discomfort with slightly elevated blood pressure. Plaintiff was referred for a chest x-ray and instructed to follow-up with Dr. Hebbar in a couple of days. Tr. 295. On October 20, 2000, Dr. Hebbar reevaluated Plaintiff and noted that she had a strong family history of lupus erythematosus and expressed concern that Plaintiff's symptoms might stem from a connective tissue disease given the nature of her chest pain. Tr. 296.

Dr. Edwin Smith, a rheumatologist with MUSC Rheumatology and Immunology, evaluated Plaintiff on November 14, 2000, for connective tissue disease versus lupus noting that she had been experiencing fatigue and chest pain since August 2000. He reported her labs were positive for anti-nuclear antibodies ("ANA") and elevated erythrocyte sedimentation rate ("ESR") levels. Dr. Smith assessed Plaintiff with pleurisy, polyarthritis, and opined that she likely suffered from systemic lupus erythematosus ("SLE") for which he prescribed Plaquenil. Tr. 158-160.

On February 8, 2001, Plaintiff reported she suffered from non-exertional tingling and numbness to her right hand that radiated into her arm and was worse at night. Dr. Hebbar's examination was unremarkable. Tr. 299-300. On March 15, 2001, Dr. Hebbar assessed Plaintiff with uncontrolled blood pressure and questionable carpal tunnel syndrome for which he prescribed a wrist splint. In May 2001, he saw Plaintiff again for complaints of pulsating awareness at the front of her neck unaccompanied by shortness of breath that he assessed as palpitations.  Tr. 303.

Plaintiff saw Dr. William H. Lee, an ophthalmologist at Charleston Eye Care, on May 14, 2001.  Examination of Plaintiff's eyes was essentially unremarkable. It was noted that Plaintiff was on Plaquenil therapy for SLE and rheumatoid arthritis, and there was no evidence of toxicity from this medication. Tr. 177, 184.

Plaintiff complained to Dr. Hebbar that her lupus muscular pain was considerable on June 19, 2001.  She was unable to tolerate Motrin and tried Naproxen and Celebrex in the past. He prescribed Vioxx and increased her Atenolol to 50mg every other day. Tr. 304. On August 28, 2001, Dr. Hebbar evaluated Plaintiff for complaints of significant fatigue, fluctuating mood, atypical chest pain, significant low back pain, and hip pain radiating to both thighs. He noted straight-leg raise was

difficult to assess because of bilateral hip joint pain. Dr. Hebbar opined that Plaintiff was possibly suffering from a flare up of her lupus and side effects from Atenolol. Tr. 304-307.

Lumbar spine x-rays from August 2001 revealed Plaintiff had multi-level DDD with facet joint hypertrophy (enlargement of the facet joints, or the connections between the bones of the spine) of her lumbar spine. Tr. 165. Plaintiff underwent physical therapy through the middle of October 2001 to address hip and back pain. Plaintiff reported decreased back pain and her gait was improved, but her hip remained problematic. Tr. 196-204.

During Dr. Hebbar's September 7, 2001 evaluation, Plaintiff reported she felt miserable with palpitations, pulsations in her neck, fatigue, shortness of breath, and generalized malaise. It was noted that a Holter monitor recorded many supraventricular ectopics and runs of narrow complex tachycardia. Dr. Hebbar assessed this as possible supraventricular tachycardia. Tr. 311. Dr. Hebbar evaluated Plaintiff again on December 7, 2001, noting she was experiencing a sensation of pounding, draining, and a lump in her throat for two weeks that sometimes occurred at night awaking her from sleep. He concluded, after a lengthy discussion with Plaintiff, that these symptoms might represent true panic disorder. Dr. Hebbar suggested Plaintiff try Paxil for three to six months and prescribed Trazedone to help her sleep. Tr. 312.

NP Mallin evaluated Plaintiff on August 29, 2002, noting that she had a long history of palpitations and described symptoms not associated with conscious anxiety. Although he did not believe Plaintiff was suffering from anxiety disorder, NP Mallin prescribed Paxil because Plaintiff's physical symptoms were typical of that condition.  Tr. 320.

Dr. Keith Merrill of MUSC's Department of Orthopedic Surgery initially evaluated Plaintiff on October 17, 2002, for right groin pain for approximately three weeks and continuous back pain which she stated had improved at the time she developed groin and buttock pain. His exam revealed positive femoral nerve stretch test with discomfort to her hip on range of motion. Dr. Merrill assessed Plaintiff with probable upper level lumbar disc disease with radiculopathy.

An MRI of Plaintiff's lumbar spine dated November 1, 2002, revealed multi-level disc osteophyte complexes which produced mild bilateral neural foraminal exit stenosis with apparent nerve root impingement at L3, multi-level L3 through S1 ligamentum flavum, and facet hypertrophy producing a mild to moderate spinal canal stenosis. Tr. 381.  On November 7, 2002, Dr. Merrill saw Plaintiff at a follow up and reported her MRI was consistent with spinal stenosis for which he prescribed Vioxx and referred her to the pain clinic for possible epidural steroid injections. Tr. 287.

On December 9, 2002, Plaintiff required emergency room treatment for left-sided chest pain that was diagnosed as lupus-related pleuritis. Tr. 367-369. Plaintiff reported the next day that she felt somewhat better, but had to take shallow breaths to prevent pain. Dr. Hebbar noted that he did not hear any pleural or pericardial rubs, but noted positive straight-leg raise testing on the left side. He assessed chronic back pain and acute chest pain. Tr. 323.

On February 25, 2003, Dr. Hebbar noted that straight-leg raise was restricted to forty degrees on the right side. Dr. Hebbar assessed the back pain as osteoarthritis. Tr. 324. NP Vanessa Diaz examined Plaintiff on March 24, 2003, for complaints of dizziness with postural changes especially when going from sitting to standing and assessed Plaintiff with hypertension. Tr. 325-326. Plaintiff complained of musculoskeletal pain on August 28, 2003.  Her pulse was regular, her heart sounded normal, and her chest was clear. Tr. 337.

7

Progress notes from James Island Internal Medicine dated June 20, 2003, reveal that Plaintiff wore a back brace, could not grip, and walked with a cane. A musculoskeletal exam revealed pain on all motions. Tr. 166-168.

Dr. Todd Detar evaluated Plaintiff on August 14, 2003, noting that her blood pressure remained uncontrolled, she continued with flutter in her chest, and she did not feel well. He opined that her lupus could be a contributing factor affecting her condition. Tr. 333-335.

On August 15, 2003, Plaintiff complained of persistent palpitations in her neck, some dizziness, and slightly out-of-control blood pressure.  Dr. Hebbar noted that Plaintiff's pulse remained regular during his examination.  It was suggested that she take potassium pills for two weeks to improve her dizziness and fatigue. Tr. 336. On August 28, 2003, Dr. Hebbar noted that Plaintiff had no complaints of headache, blurred vision, chest pain, or shortness of breath, but she reported musculoskeletal pain.  Tr. 337.

Physician Assistant ("PA") Peter Dodge of MUSC examined Plaintiff on March 20, 2004, for complaints of vertigo upon awakening that morning. Examination revealed antalgic gait secondary to chronic back, hip, and knee osteoarthritis. Plaintiff continued to complain of back pain. Her heart had no abnormalities, her extremities were normal, her reflexes were intact, and her motor strength was full (5/5). Tr. 344-345.

On June 17, 2004, Plaintiff presented to Dr. Hebbar complaining of chest pain, which was presumed to be muscular or a lupus flare up. Examination of her heart and extremities were reportedly normal. Tr. 349. Plaintiff received more physical therapy for her back and hip pain in August and September 2004. Tr. 205-232. At her initial evaluation, she had some limits in her range of motion in her trunk.  See Tr. 231.  By the time she was discharged to a home exercise program on

8

September 16, 2004, she had increased the range of motion in her hip to within normal limits. Tr. 232.

Dr. E. Smith (rheumatologist) reevaluated Plaintiff on November 30, 2004, for follow up of high ESR, hip pain, and lumbar disc disease. Tr. 351-353. He assessed Plaintiff with persistently elevated ESR and low titer ANA and prescribed Plaquenil. Tr. 351-353.

Plaintiff complained to Dr. Detar of left shoulder pain on January 13, 2005, and examination showed she had a limited range of motion in that shoulder. Her shoulder strength ranged from 3/5 to 5/5, depending on the movement. Tr. 354-356.  A cervical spine MRI from February 28, 2005 showed degenerative changes, but no herniation, with some hunched posture. Tr. 373. Plaintiff received further physical therapy in March, April, and May of 2005 for neck and shoulder pain. Tr. 233-284. At her last appointment, Plaintiff had some limits to her neck range of motion, but had full, or nearly full strength in all areas, with the exception of "notably weaker" grip in her left hand. Sensation was intact, with only occasional decrease along her later left hand, lower arm, and last two fingers. Tr. 283. A lumbar spine x-ray from October 13, 2005 revealed that Plaintiff had DDD in the L4-L5 and L5-S1 regions. Tr. 370. On November 21, 2005, Plaintiff had no chest pain, no irregular heart beat, and no dizziness, no weakness or numbness, normal gait, and no limits to the range of motion in her back. He assessed that there was little evidence of active connective tissue disease, her ESR remained elevated, and she had back and hip symptoms from DDD. Tr. 491-492.

Dr. Smith reevaluated Plaintiff on May 10, 2005, noting that she continued to have sleeping difficulties due to positioning, she had neck and back pain, and she had some weakness and pain in her hand. He assessed cervical and lumbar degenerative joint disease and advised her to continue with her medications. Tr. 359-361. Physical therapy notes dated May 25, 2005, reveal that Plaintiff

continued with left arm weakness and multiple areas of osteoarthritis. The therapist opined that she had reached maximal improvement from this standpoint with little improvement made over the then past month. Tr. 283-284.

PA Dodge reevaluated Plaintiff on September 29, 2005, for four days of increased fatigue which he associated with exacerbations of her lupus. Exam revealed trace edema to her extremities and anemia that PA Dodge suspected was caused by Plaintiff's chronic disease process. Tr. 362-363.

On October 13, 2005, Plaintiff complained to Dr. Hebbar about experiencing an acute flare up of back and right hip pain accompanied by morning stiffness that prohibited her from walking and made sleeping difficult. Exam was positive for depressed affect, limited range of motion in her right hip due to pain, shoulder stiffness bilaterally, and positive straight leg raise on the right. Dr. Hebbar noted that Plaintiff walked with a limp. He assessed possible acute flare up of connective tissue disease for which he prescribed Prednisone.  Tr. 364-365. X-rays of Plaintiff's right hip showed that it was normal appearing, with the visualized part of her lumbar spine showing significant loss of disc space height and large osteophytes at the vertebral end plates. Tr. 370.

Dr. Smith reevaluated Plaintiff on November 21, 2005, for continued complaints of back pain radiating into her leg and noted she was recently treated with Prednisone, which caused insomnia. Examination revealed tenderness to right paraspinal and gluteal area. Dr. Smith noted that ESR remained elevated, but other indicators appeared normal. He attributed her symptoms to "lumbar DDD." Tr. 490-493.

A lumbar spine MRI on December 13, 2005, showed multi-level degenerative changes, but did not show any nerve root impingement. Tr. 439. Dr. Hebbar noted Plaintiff had a positive straight-leg raise test on the right on December 28, 2005, as well as some weakness in her legs. Tr. 482.

10

On December 27, 2005, Dr. Daniel Bates performed a disability evaluation. Plaintiff reported that she had to walk with a cane; could walk for twelve minutes and stand for twenty minutes; had difficulty with stairs and overhead lifting; had back, neck, and joint pain; had stiffness and weakness; and had limitation of motion. Dr. Bates noted that Plaintiff walked very slowly with a cane and had reduced range of motion of the lumbar spine, but had normal reflexes and normal range of motion of extremities. He diagnosed Plaintiff with hypertension, lupus, rheumatoid arthritis, back pain, and symptoms involving her neck and head. Tr. 411-414.

On February 2, 2006, Dr. John Glaser, an orthopaedist, noted that Plaintiff had normal reflexes and sensation in her upper and lower extremities, normal (5/5) strength, and no muscle atrophy. Tr. 479-480. At the MUSC pain clinic on March 2, 2006, Plaintiff had no sensory deficits, and her muscle strength was normal in her upper and lower extremities. She had no psychomotor retardation. A steroid injection to her right hip was administered. Tr. 475.

Plaintiff was seen for complaints of elbow pain on April 20, 2006. Tr. 470-471. She had no weakness or numbness, normal range of motion, and her muscle strength was normal (5/5). Dr. Smith assessed tendinitis with questionable nerve entrapment. Tr. 470-471. On November 28, 2006, a physical examination showed Plaintiff continued to have normal sensation and reflexes in her upper and lower extremities, did not have any strength deficits, and also had no documented limits to her range of spinal movement. Tr. 447-448.

## HEARING TESTIMONY

At the first hearing before the ALJ (January 2009), Plaintiff testified that she was diagnosed with lupus in 2000 and she had rheumatoid arthritis. She said she felt too exhausted and was in too much pain to work, so she retired from her job with the State. Tr. 25-26. Plaintiff testified that her

symptoms included shortness of breath, fatigue, and back pain. She took medications and had a TENS unit, but said they only took the edge off her pain. Tr. 26-28. Plaintiff also reported that she had arthritis pain in her hands at the end of 2006 and had pain in her back and neck in 2004 and 2005. Tr. 29. Plaintiff testified that she had been using a cane since 2004 or 2005 and that a doctor prescribed it because of hip and back pain and her leg sometimes giving way. Plaintiff stated that between 2001 and 2005, she was able to do activities in spurts, but had to rest between tasks. Tr. 30. Plaintiff could be active for one to two hours, but then had to rest for about three hours. Tr. 31.

At the second hearing before the ALJ (December 2011), Plaintiff complained of trouble breathing, fatigue, chest pain radiating to her back, and hand pain. Tr. 658- 661. She stated that her duties as a secretary included using a computer, filing paperwork, answering the phone, sending faxes, fetching supplies, and searching for doctors. Tr. 660-661. She testified that her coworkers helped her if she was tired. Tr. 661.

**<u>DISCUSSION</u>**

Plaintiff alleges that: (1) the ALJ failed to fully comply with the 2011 District Court remand order[2] at steps 3 and 4 of the sequential evaluation process; (2) the ALJ should have found that she

---

[2]In his January 24, 2011 order, the Honorable Richard Mark Gergel, United States District Court Judge, noted that the record reflected the ALJ failed to properly consider whether Plaintiff met or equaled Listing 1.04, the ALJ must adequately explain his evaluation of a claimant's combined effect of impairments, it did not appear that the ALJ considered all of the evidence in determining that Plaintiff's lupus was not a severe impairment, and the ALJ might need to revisit his findings concerning Plaintiff's RFC on remand. Judge Gergel reversed the denial of benefits pursuant to sentence four of 42 U.S.C. § 405(g) and remanded the case to the Commissioner for further administrative action based on these grounds and the grounds set forth in the undersigned's Report and Recommendation (to consider whether Plaintiff's lupus was a severe impairment, consider Plaintiff's impairments in combination, determine whether Plaintiff met or equaled Listing 1.04A, and continue the sequential process if necessary). <u>Edwards v. Astrue</u>, 3:09-3187-RMG, ECF No. 30, <u>see also</u> ECF No. 22.

met the Listing of Impairments ("Listings"), 20 C.F.R. Pt. 404, Subpt. P., App. 1 at § 1.04 and/or § 14.02; (3) the ALJ failed to conduct a proper combined effect analysis at step three of the sequential evaluation process; (4) the ALJ misapplied the doctrine of res judicata to Plaintiff's 2003 application for DIB; and (5) substantial evidence[3] does not support the ALJ's determination that Plaintiff was capable of performing her past relevant work. The Commissioner contends that: (1) substantial evidence supports the ALJ's findings that Plaintiff was not disabled under the Social Security Act; (2) the ALJ reasonably found that Plaintiff's impairments did not meet or equal a listed impairment; (3) the ALJ properly determined that Plaintiff's prior rejected claim moved her alleged onset date forward based on res judicata; and (4) substantial evidence supports the ALJ's finding that Plaintiff can perform her past relevant work as described in the Dictionary of Occupational Titles ("DOT").

A.    Listings/Combination of Impairments

Plaintiff alleges that the ALJ failed to properly evaluate her impairments at step three because he failed to find that she met or equaled Listing 1.04A and/or 14.02. The Commissioner

---

[3]Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

contends that Plaintiff failed to meet her burden of showing that she met or equaled either of these Listings.[4]

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment.  20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant has to establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met."  DeLorme v. Sullivan, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

Plaintiff argues that she met Listing 1.04A because she suffers from cervical, thoracic, and lumbar spinal disorders as evidenced by radiological imaging and confirmed on objective physical

---

[4]In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520.  The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy.  See id.

examinations.  She argues that the ALJ erred by conclusory stating that she did not meet Listing 1.04 without specific references to the evidence. The Commissioner contends that the ALJ reasonably found that Plaintiff did not meet Listing 1.04 because the objective medical findings were not present consistently, and not for the required duration. Additionally, the Commissioner contends that Plaintiff fails to identify specific evidence to support her assertion that her impairments were medically equivalent to the listed impairment. The Commissioner specifically notes that during the relevant time period (July 16, 2003 through December 31, 2006), Plaintiff had only a single positive straight-leg raise test (with no indication if it was sitting or supine or both), accompanied by some weakness in her legs (Tr. 482), but no further positive signs. As to the other requirements, the Commissioner notes that in February 2006, Plaintiff had normal strength in her legs and no indication of another positive straight-leg test (Tr. 479-480).

The Listing at § 1.04 requires:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04A.

The ALJ's determination that Plaintiff did not meet Listing 1.04A during the relevant period is supported by substantial evidence and correct under controlling law. The ALJ specifically found that while Plaintiff did have nerve root compression with some limitation of motion of the spine, motor loss, sensory/reflex loss, and positive straight-leg raising on occasion, the findings were not

15

consistent during the period in question. Tr. 643. The ALJ, discussing Plaintiff's combination of impairments, also noted that Plaintiff failed to show that there was consistent limitation of motion of her spine, motor loss with sensory or reflex loss, or positive straight-leg raise testing. Although positive straight-leg raise testing was noted in October and December 2005, the ALJ found that Plaintiff did not meet the other requirements, noting that following a course of Prednisone in October 2005, Plaintiff had no motor weakness in her extremities (Tr. 366, 646); deep tendon reflexes were normal in December 2005 (Tr. 413, 646); and Plaintiff had normal motor strength and intact sensation in March 2006 (Tr. 475, 646). Plaintiff points to various evidence that she had some of the requirements of §1.04A at various times, but she fails to meet her burden of showing that she met or equaled all of the criteria of §1.04A for a twelve-month period during the relevant time period.

The Listing at § 14.02 requires a claimant to show that he or she has systemic lupus erythematosus as described in 14.00D1[5] with:

> A. Involvement of two or more organs/body systems, with:
>> 1. One of the organs/body systems involved to at least a moderate level of severity; and
>> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

---

[5]This provides:
Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.
20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00D1.

or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

    1. Limitation of activities of daily living.

    2. Limitation in maintaining social functioning.

    3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.02.

Plaintiff argues that she met § 14.02 because there is medical evidence which documents involvement of two or more of her organs (heart and lung) of at least moderate severity. She asserts that she has evidence of severe fatigue, symptoms thought to be attributable to anxiety disorder, shortness of breath, malaise, chest fatigue, symptoms thought to attributable to anxiety disorder, positive laboratory testing, and muscular pain. The Commissioner contends that Plaintiff fails to identify evidence that would meet the criteria necessary to satisfy this Listing.

Plaintiff fails to show that she met or equaled Listing 14.02A because she has not shown involvement of two or more organs/body systems, with at least one of moderate severity. In support of her argument that she met or equaled this Listing, Plaintiff only cites to a report from Dr. Hebbar in September 2001 that her Holter monitor indicated she suffered from supraventricular tachycardia. Review of the record, however, only indicates that this was a tentative diagnosis with further testing to be done. Tr. 311. At her December 2001 appointment with Dr. Hebbar, this tentative diagnosis was no longer present. Tr. 312. Further, evidence in the record frequently showed no abnormalities in Plaintiff's heart or lungs. See, e.g., Tr. 337 (hypertension settling, heart palpitations settled in September 2003), 345 (no heart abnormalities in March 2004), 349 (heart normal in June 2004), 365 (heart rate regular with no murmur or gallop, lungs clear to auscultation in October 2005). She also fails to show that she met or equaled 14.02B, as she has not showed the required marked limitations.

17

Plaintiff appears to argue that the ALJ erred in not properly considering whether her combination of impairments met or equaled a listing. The ALJ's consideration of Plaintiff's combination of impairments is supported by substantial evidence and correct under controlling law. He specifically found that Plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments and discussed his reasons for his finding. Tr. 643-644. The ALJ specifically discussed all of Plaintiff's severe and non-severe impairments (see Tr. 644-647) in his decision. See Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992)(ALJ sufficiently considered impairments in combination where he separately discussed each impairment, the complaints of pain and daily activities, and made a finding that claimant's impairments did not prevent the performance of past relevant work). The ALJ also considered Plaintiff's combination of impairments in his hypothetical to the VE.  See Tr. 662-664.[6]

B.    Past Relevant Work

Plaintiff appears to argue that the ALJ erred at step four in determining that she could perform her past relevant work because she was receiving accommodations, including having other employees doing some of her tasks, in order to perform her job. The Commissioner contends that substantial evidence supports the ALJ's findings that Plaintiff can perform her past relevant work as described in the DOT.

At step four of the disability inquiry, a claimant will be found "not disabled" if the claimant is capable of performing his or her past relevant work either as he or she performed it in the past or

---

[6]The ALJ's RFC determination is also supported by substantial evidence including objective medical evidence, that none of Plaintiff's treating or evaluating physicians made any medical opinion regarding her functional limitations, that Dr. Bates documented an essentially unremarkable musculoskeletal examination in December 2005, the opinions of State agency medical consultants, and her activities of daily living.  See Tr. 646-64.

as it is generally required by employers in the national economy.  SSR 82-61.  The claimant bears

the burden of establishing that he or she is incapable of performing his or her past relevant work.  See

Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.

1992).

        In the present action, the ALJ specifically found that Plaintiff had the RFC to sit for six hours

and to stand/walk for two hours in an eight-hour day; frequently lift/carry light items; occasionally

lift ten pounds; never climb, crawl, be exposed to hazards; occasionally perform overhead reaching;

occasionally crouch and stoop; and frequently perform fine fingering and handling.  The VE testified

that Plaintiff's past relevant work as a secretary was classified as light work. In response to a

hypothetical about a claimant with the same age, education, and work background as Plaintiff with

the RFC as described above (see Tr. 663), the VE testified that the claimant could perform the job

as described in the DOT.  Tr. 664. The ALJ specifically acknowledged that Plaintiff's past relevant

work as she described it was light work, such that she could not perform it.  He, however, found that

Plaintiff could perform her work as it is generally performed in the economy based on the VE's

testimony. See Tr. 647. Here, the ALJ's determination that Plaintiff is not disabled because she could

perform her past relevant work is supported by substantial evidence including the VE's testimony

that a claimant with Plaintiff's limitations could perform work as a secretary as it is generally

performed as described in the DOT. See SSR 82-61.[7]

_____

        [7]In her Reply Brief, Plaintiff argues for the first time that the ALJ's limitation to sedentary work at the 2011 hearing, combined with the fact that the VE classified her past relevant work in part as light, called for an automatic finding of disabled under the Medical-Vocational guidelines under Rule 201.10.  Here, however, the ALJ found Plaintiff was not disabled at step four because she could perform her past relevant work as it is generally performed in the economy. Only if the claimant is unable to do any past relevant work or does not have any past relevant work, does the analysis
(continued...)

C.    Res Judicata

On July 15, 2003, Plaintiff was found not disabled as to a prior application (2003) for benefits.  She did not appeal that finding.  In her Brief, Plaintiff argues that the ALJ misapplied the doctrine of res judicata to her 2003 application for DIB because the ALJ erred in finding that the 2003 application involved the same rights of the same party, the same material facts, and the same issues.  She asserts that the 2003 application is different because it reflected an onset date of August 1, 2000, when she was still earning above the substantial gainful activity ("SGA") level, but her subsequent application reflected a corrected onset date of July 24, 2001.  She provided no authority for these assertions. The Commissioner contends that the ALJ properly determined that Plaintiff's prior rejected claim moved her alleged onset date forward based on res judicata.  The Commissioner argues that because Plaintiff did not appeal the finding on her 2003 application, she is bound by the Agency's decision that she was not disabled through July 15, 2003, as these cases involve the same party, the same material facts with respect to her impairments, and the same issues surrounding those impairments.  For the first time in her Reply Brief, Plaintiff argues that her subsequent claim is not the same for res judicata purposes because her 2003 claim was denied on the basis that she retained the capacity to perform her "customary past work" at the SGA level and did not state she was capable of performing her past relevant work as it is generally performed.  She argues that the ALJ improperly applied res judicata to her claim which alleged an onset date of July 24, 2011, because

_____

[7](...continued)
proceed to the fifth and last step in the sequential evaluation process. 20 C.F.R. §§ 404.1520(f) and 404.1520(g) ; 20 C.F.R. Pt. 404, Subpt. 1, App. 2, § 200.00(a)("The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work.").

it is not the same as her 2003 claim which alleged an onset date of August 1, 2000. Plaintiff argues that the ALJ failed to comply with AR 00-01(4) by barring her 2005 claim on the basis of res judicata without first considering the new and material facts she presented at the hearing.

If the claimant does not pursue administrative appeal rights, the administrative determination or decision becomes binding. See 20 C.F.R. §§ 404.905, 404.921. A district court has no jurisdiction to review the Commissioner's res judicata decisions unless the claimant has raised a colorable claim of a constitutional violation. Califano v. Sanders, 430 U.S. 99 (1977); see Shrader v. Harris, 631 F.2d 297, 300 (4th Cir. 1980)("Adjudication of constitutional questions remains an exception to the rule against judicial review."). Here, Plaintiff has not alleged such a claim. Jurisdiction to review may also exist where, even though the Commissioner purported to rest denial of reopening on principles of administrative res judicata, a review of the record discloses that the merits of the claim actually have been considered. McGowen v. Harris, 666 F.2d 60, 65-66 (4th Cir. 1981). Here, review of the record fails to show that the merits of the prior (2003) claim was reconsidered by the ALJ in his January 2012 decision. There is no indication that there was a "de facto" reopening by the Commissioner. In his decision, the ALJ wrote:

> The doctrine of res judicata is applicable to the issues of disability between the claimant's alleged onset of disability and July 15, 2003, inasmuch as the same parties, material facts, and issues were involved in the prior decision. 20 C.F.R § 404.957(c) and 416.1457(c).

Tr. 647.

Plaintiff next argues that the prior claim should be reviewed by the Court pursuant to AR 00-1(4). This Acquiescence Ruling addresses the effect of prior disability findings on the adjudication of a subsequent disability claim. The Ruling specifically provides that it applies only to a finding "which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim."

21

AR 00-1(4), 2000 WL 43774, *4.  Here, Plaintiff's prior (2003) claim was not decided at the ALJ

or Appeals Council level, but was denied on initial review and was not appealed by Plaintiff.

## **CONCLUSION**

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be

affirmed.

Joseph R. McCrorey
United States Magistrate Judge

June 27, 2013
Columbia, South Carolina

22