IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Gloria Jean Edwards, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 3:12-693-RMG |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting Commissioner ) | |
| of Social Security, ) | **ORDER** |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff has brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB"). In accord with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 DSC, this matter was referred to a United States Magistrate Judge for pre-trial handling. The Magistrate Judge issued a Report and Recommendation on June 27, 2013, recommending that the Commissioner's decision be affirmed. (Dkt. No. 25). Plaintiff filed objections to the Report and Recommendation and the Commissioner filed a reply. (Dkt. Nos. 27, 31). As more fully set forth below, the decision of the Commissioner is reversed and remanded for further action consistent with this order.

**Legal Standard**

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is

made. The Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of the factual circumstances that substitutes the Court's findings of fact for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

Although the federal court's review role is a limited one, "it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). Further, the Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987).

The Commissioner, in passing upon an application for disability benefits, is required to undertake a five-step sequential process. At Step One, the Commissioner must determine whether the applicant is engaged in substantial gainful work. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful employment, the Commissioner proceeds to Step Two, which involves a determination whether the claimant has any "severe medically determinable physical or mental impairment." *Id.* § 404.1520(a)(4)(ii). If the claimant has one or more severe impairments, the Commissioner proceeds to Step Three, which involves a

determination whether any impairment of the claimant satisfies any one of a designated list of impairments that would automatically render the claimant disabled. *Id.* § 404.1520(a)(4)(iii). Further, even if a claimant's condition does not meet all of the requirements of a listing, a claimant may be declared disabled at Step Three if she is able to show that another impairment or combination of impairments are the medical equivalent of the listed impairment. 42 U.S.C. § 423(c)(2)(b); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); 20 C.F.R. § 404.1526(b).

If the claimant does not have a listed impairment, the Commissioner must proceed to Step Four, which involves an assessment of the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv). This requires assessment of the claimant's ability "to meet the physical, mental, sensory, and other requirements of work." *Id.* § 404.1545(a)(4). In determining the claimant's RFC, the Commissioner "must first identify the individual's functional limitations or restrictions" and provide a narrative "describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8P, 61 Fed. Reg. 34474, 34475, 34478 (July 2, 1996).

Once the claimant's RFC is determined, the Commissioner must assess whether the claimant can do his past relevant work. 20 C.F.R. §§ 404.1520(4)(iv), 1545(a)(5)(i). If the claimant, notwithstanding the RFC determination, can still perform his past relevant work, he is deemed not to be disabled. If the claimant cannot perform his past relevant work, the Commissioner then proceeds to Step Five to determine if there is other available work in the national economy he can perform in light of the RFC determination. *Id.* § 404.1520(a)(4)(v).

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of medical sources, including treating

physicians. *Id.* § 404.1545. The regulation, known as the "Treating Physician Rule," imposes a duty on the Commissioner to "evaluate every medical opinion we receive." *Id.* § 404.1527(c). The Commissioner "[g]enerally . . . give[s] more weight to opinions from . . . treating sources" based on the view that "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* § 404.1527(c)(2). Further, the Commissioner "[g]enerally . . . give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." *Id.* § 404.1527(c)(1).

Under some circumstances, the opinions of the treating physicians are to be accorded controlling weight. Even where the opinions of the treating physicians of the claimant are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of specifically identified factors, including the examining relationship, the nature and extent of the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician is a specialist. *Id.* §§ 404.1527(c)(1)-(5). The Commissioner is obligated to weigh the findings and opinions of treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96-2P, 61 Fed. Reg. 34490, 34492 (July 2, 1996).

## Discussion

This appeal represents the second time this Court has addressed Plaintiff's application for disability benefits. The Court previously reversed and remanded the Commissioner's denial of

disability benefits because the decision of the Administrative Law Judge ("ALJ") significantly understated the medical evidence in the record concerning the Plaintiff's impairments. *Edwards v. Astrue*, C.A. No. 3:09-3187-RMG-JRM, 2010 WL 5575482 (D.S.C. Dec. 22, 2010), *report and recommendation adopted by* 2011 WL 121799 (D.S.C. Jan. 12, 2011). First, the Court noted that the ALJ had failed to appropriately evaluate Plaintiff's significant spinal cord disorders under Listing 1.04A on the erroneous finding that the claimant's MRI did not demonstrate nerve root impingement. *Id.* at *6-7.[1] The Court specifically referenced an MRI report that explicitly found nerve root impingement. Transcript of Record (hereafter "Tr.") at 381. The Court directed the Commissioner on remand to evaluate Plaintiff's claim under the Listing 1.04A in light of the record evidence.[2] Second, the Court reversed the ALJ's finding that Plaintiff's lupus was not a severe impairment, referencing numerous medical records documenting the claimant's multiple flare-ups and complications from this condition. 2010 WL 5575482, at *8. Third, the Court directed on remand the ALJ to consider the combined effects of the claimant's spinal cord disorders and lupus and to "adequately explain his evaluation of the combined effect of these impairments." *Id.*

After conducting another evidentiary hearing on December 20, 2011, the ALJ issued a new decision, again concluding that Plaintiff failed to satisfy the requirements for Social Security disability. In reaching that conclusion, the ALJ acknowledged that while Plaintiff did have

---

[1] All references to Listings can be found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

[2] The ALJ also erroneously stated in his prior decision that there was no radiographic evidence of spinal stenosis. Tr. at 15. The record, in fact, documented radiographic evidence of spinal stenosis in lumbar spine MRI's of November 1, 2002, and December 13, 2005. Tr. at 381, 439. This was another example of the ALJ materially understating the degree of Plaintiff's impairments.

record evidence of nerve root compression secondary to her degenerative disc disease with some evidence of limitation of motion of the spine, motor loss, and positive straight leg raises, "these findings have not been consistent during the period in question." Tr. at 643. Thus, the ALJ concluded that Plaintiff did not meet the requirements for Listing 1.04A.

The ALJ further modified his finding regarding Plaintiff's lupus, concluding that it was, in fact, a severe impairment. Tr. at 642. This was not an insignificant finding because lupus can produce directly and indirectly potentially disabling symptoms in many body systems, including in the musculoskelatal, respiratory, and mental health areas. The condition, which is characterized as a chronic inflammatory disease, can be accompanied by severe fatigue and malaise and can present in a highly variable pattern, producing severe symptoms intermittently with intervening periods of relative remission. Listing 14.00(D)(1)(a). For a patient with chronic degenerative changes in her spine, such as Plaintiff, lupus can significantly exacerbate the orthopaedic symptoms.

The ALJ's new finding that Plaintiff's severe impairments included lupus obligated him to consider whether Plaintiff satisfied the Listing for lupus, found at 14.02. This Listing provides that the claimant can establish her disability through meeting the requirements of either 14.02A or 14.02B. Under 14.02A, the claimant must demonstrate the involvement of two or more organs or body systems and the presence of at least two "constitutional symptoms," which include severe fatigue, fever, malaise, or involuntary weight loss. Under 14.02B, the claimant can satisfy the Listing by showing repeated manifestations of lupus with at least two constitutional symptoms and the presence of marked limitations on activities of daily living, social functioning, or limitations secondary to deficiencies in concentration, persistence, or pace.

-6-

For reasons unexplained by the ALJ, he addressed only the specific provisions of Listing 14.02A, finding that Plaintiff's lupus-related respiratory difficulties were not sufficiently severe to meet the Listing requirement. Tr. at 643. The ALJ did not address the specific provisions of Listing 14.02B. This is hardly an immaterial oversight since the record establishes that Plaintiff experienced recurrent episodes of lupus "flare-ups," Tr. at 167-68, 285, 307, 324, 349, 351, 354, 355-56, 362, 364-65, 369, 446, 470-71, 485, 487-89, and there was considerable evidence that her various chronic conditions impacted her ability to maintain the persistence and pace necessary to perform employment, Tr. at 208, 226, 307, 364-65, 411, 446, 477, 482.

The ALJ also made a conclusory finding that the combined effects of Plaintiff's impairments did not equal in severity any of the Listings. The ALJ, while acknowledging that "the combination of the claimant's impairments does impose some limitations" (which were unspecified by the ALJ), stated what Plaintiff's combination of impairments *did not* produce. The ALJ found that Plaintiff's combination of impairments did not include an inability to ambulate in both lower extremities, perform fine or gross motor movements in her upper extremities, or produce any consistent limitation in spinal motion, reflexes, or straight leg raises. Tr. at 644. Beyond failing to actually articulate the combined effects of Plaintiff's lupus and spinal cord disorders, as explicitly directed by this Court on remand, the ALJ did not address in any detail the issue of whether the combined effect of these impairments might constitute the medical equivalent of Listings 1.04A or 14.02A or B.

A review of Plaintiff's extensive medical history, covering the period until Plaintiff's date last insured of December 31, 2006, reveals the significance of the ALJ's failure to address in detail the combined effect of Plaintiff's multi-level degenerative disc disease and lupus. The

-7-

record indicates that as early as November 2000 Plaintiff was documented with various symptoms ultimately associated with her lupus, including fatigue, pleuritic chest pain, knee and hand swelling, and an elevated sedimentation rate. Tr. at 158-59. She was seen in August 2001 by Dr. Kesh Hebbar, a board certified family physician and clinical associate professor at the Medical University of South Carolina (MUSC), who would become her primary treating physician. Dr. Hebbar documented Plaintiff's significant fatigue, atypical chest pain, fluctuating mood, and low back pain radiating to her hips and thighs. His differential diagnosis included a possible lupus "flare-up." Tr. at 307. In December 2001, Plaintiff returned to Dr. Hebbar with atypical pains in her neck, producing a foreign body sensation. Dr. Hebbar suspected this was anxiety related. Tr. at 312, 314. Plaintiff continued to complain to Dr. Hebbar about her back and hip pain and he referred her to the Orthopaedic Department at the Medical University for further evaluation. This led to a diagnostic work up that included an MRI of the lumbar spine on November 1, 2002, which revealed that Plaintiff had multi-level stenosis of the lumbar spine with impingement at the L3 nerve root. Tr. at 381.

Dr. Hebbar evaluated Plaintiff again on December 10, 2002, following a visit the previous day to the MUSC Emergency Room for pleuritic chest pain, a common complication of lupus. Tr. at 323. Dr. Hebbar's physical examination documented the presence of chronic back pain with positive straight leg raises on the left side. Dr. Hebbar's note reveals that he discussed with Plaintiff the natural history of lupus and intermittent nature of the symptoms. Plaintiff was seen on December 19, 2002, in the Orthopaedic Clinic and it was noted that her spinal stenosis symptoms had improved with the passing of her lupus flare-up. Tr. at 288. This interplay between Plaintiff's orthopaedic symptoms and her lupus would be repeatedly documented in the

ensuing years of her medical treatment, producing severe pain during and following the claimant's lupus "flare-ups."

Dr. Hebbar saw Plaintiff on February 25, 2003, and she complained of persistent back pain. He documented that her straight leg raises were limited to 40 degrees on the right side. Tr. at 324. James Island Internal Medicine saw Plaintiff on June 20, 2003, and she was documented with lupus, rheumatoid arthritis, L-3 nerve root compression, lack of energy, and tendonitis in her wrist, preventing her from gripping things. Tr. at 167. The MUSC Family Medical Clinic saw her several times in August 2003 when she complained of hypertension, dizziness, and heart palpitations. She was noted to be walking with a cane. Tr. at 333, 336-37. Concern was expressed that her lupus could be complicating her elevated blood pressure problems. Tr. at 333.

Plaintiff was documented in June 2004 to have chest pain and a potential lupus "flare-up" was suspected. Tr. at 349. She was referred in August 2004 to physical therapy for back and hip pain radiating to her right knee. Tr. at 207. She was noted to be able to perform only limited housework because of her pain and ambulated with a cane. She was documented to be able to perform only five to fifteen minutes of exercise at a time and her condition was complicated by her lupus and rheumatoid arthritis. *Id.* At the completion of her physical therapy program, on August 30, 2004, the record indicates that the patient was limited in endurance by her pain. Tr. at 226.

In early 2005, Plaintiff was documented to be complaining about shoulder pain and an inability to lift her arm more than 90 degrees. Tr. at 354, 355-56. Dr. Hebbar documented a positive impingement sign in his evaluation of February 15, 2005, and an MRI performed on February 28, 2005, confirmed degenerative changes in the cervical spine at C4-5 and C5-6 with a

disc osteophyte abutting the spinal cord. Tr. at 373. A physical therapy note of March 7, 2005, documented Plaintiff's difficulty in turning her neck and observed that "[t]his appears to be nerve root compression symptoms due to OA [osteoarthritis] changes in the cervical spine." Tr. at 234. Thus, by early 2005, Plaintiff had documented significant spinal pathologies in two distinct portions of her spine. First, she had radiographic confirmation of degenerative changes at multiple levels of her cervical spine that were now producing symptoms in her upper extremities. Second, Plaintiff had long-documented degenerative disc disease in her lumbar spine that was producing pain in her lower back and radiating pain to her hips and legs. These degenerative changes included a radiographically documented abutment of an osteophyte to the spinal cord in the cervical spine and nerve root compression in the lumbar spine.

In September 2005, Plaintiff experienced another lupus "flare-up" with worsening back pain. On October 13, 2005, Dr. Hebbar documented that she was unable to walk in the mornings due to stiffness and had limited range of motion in her right hip due to pain. She had positive straight leg raises on the right and both of her shoulders were stiff. Tr. at 364-65. Plaintiff was treated with steroids and got a good response, although she developed insomnia from the medication. Tr. at 366, 490, 493. However, Plaintiff appeared to have another lupus "flare-up" in December 2005, complaining of back and right leg pain and weakness. Tr. at 487-89. She also complained of a new onset of chest pain, which was thought to be lupus related. Tr. at 485. An MRI of December 13, 2005, further documented degenerative changes in multiple levels of the lumbar spine with broad based disc bulges. Tr. at 439.

Dr. Hebbar and an examining consultant, Dr. Daniel Bates, evaluated Plaintiff in late December 2005. Dr. Bates noted that he had none of the patient's medical records available at

the time of the evaluation. He documented that the claimant ambulated slowly with a cane, had difficulty with stairs and overhead lifting, and could cook, dress, and bathe slowly without assistance. Tr. at 411-12. Plaintiff complained to Dr. Bates of fatigue, sleep disturbance, and abnormal level of activity. She further informed Dr. Bates of her persistent back, neck, and joint pain. Tr. at 412. Dr. Bates documented that Plaintiff could walk only for 12 minutes, stand for 20 minutes, and sit for one hour. Tr. at 411. Dr. Bates documented, however, a fairly benign physical examination, with limited abnormal findings in his assessment of Plaintiff's back. Tr. at 413.

Dr. Hebber, who performed his evaluation on December 28, 2005, one day following Dr. Bate's examination, described a far more troublesome presentation. Plaintiff had persistent radiating back pain, worse with walking; bilateral lower extremity weakness; and straight leg raises limited to 60 degrees. Her musculoskeletal pain was continuing as was her recurrent chest pain. Tr. at 482.

Dr. Hebbar referred Plaintiff back to the Orthopaedic Department at MUSC for a surgical evaluation of her lumbar spine in early 2006. Dr. John Glasser evaluated her and noted the patient's persistent complaints of pain that had reportedly worsened in recent months. Tr. at 477. Dr. Glasser documented that Plaintiff's condition worsened with activity but determined she had limited surgical options because the surgery would require a three level decompression and fusion and such surgery had uncertain results. Tr. at 472, 476, 479-80. Plaintiff was referred to the Pain Clinic, which provided her temporary relief with injections and blocks but the pain ultimately returned. Tr. at 474. She also began developing additional symptoms in her left and right arm and elbow, which improved somewhat with injections. Tr. at 470-71, 513. By late

2006, Plaintiff complained that her back and elbow pain were worse, particularly with activity, with similar complaints voiced to Dr. Hebbar in early 2007. Tr. at 446, 452.

This record clearly documents the presence of severe impairments arising both from the Plaintiff's multi-level degenerative disc disease in her cervical and lumbar spine and her lupus. As is frequently the case, Plaintiff's lupus symptoms were intermittent and exacerbated her underlying orthopaedic pathologies. In this complicated medical setting, it is essential that the Commissioner first evaluate all potentially relevant Listings, which in this case includes Listings 1.04A, 14.02A, and 14.02B. Since the ALJ failed to specifically address the 14.02B Listing, remand is obviously necessary.

Further, even if a specific Listing is not satisfied, the ALJ is still required to analyze the combined effects of multiple impairments to determine if they constitute the medical equivalent of one of the Listings. 42 U.S.C. § 423(d)(2)(B); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Additionally, "as a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker*, 889 F.2d at 50. A conclusory statement is not sufficient to meet this obligation to explain the combined effects of the impairments and neither is a statement about what the combined conditions do not produce. If the ALJ continues to find that the combined effect of Plaintiff's severe spinal disorders and her lupus are not the medical equivalent of either a 1.04A, 14.02A, or 14.02B Listing, the actual combined effect of these impairments should be thoroughly analyzed on remand and an explanation provided in the decision utilizing the facts in the record as applied to the specific requirements of the Listings.

On remand, the ALJ should also be mindful of the provisions of the Treating Physician

Rule, which provides greater deference to the opinions of those who have had a treating relationship with the claimant. The Court could not help but notice that those with a treating relationship with Plaintiff appeared to document a far more serious set of limitations associated with Plaintiff's impairments than the chart reviewers and the consulting examiner. To the extent that there is some conflict in the opinions of the treating and non-treating physicians, the ALJ should expressly address the standards set forth in § 404.1527(c) in determining which opinions are entitled to the greater weight.

Furthermore, should the ALJ determine that Plaintiff cannot satisfy the requirements of any Listing, the Commissioner is obligated to consider the combined effects of Plaintiff's various impairments at every stage of the Five Step Sequential Process. This should include the obvious potential interplay between Plaintiff's significant multi-level spinal disorders and her lupus, as well as the documented effect that even minimal physical activity has on exacerbating Plaintiff's spinal and lupus impairments. *See* Tr. at 207, 226, 446, 472, 477, 482.

Finally, Plaintiff challenges the decision of the ALJ that the onset date was July 15, 2003, which was the first date following a prior administrative decision denying an earlier application for Social Security disability benefits. Plaintiff now seeks to assert an onset date of July 24, 2001, the date she claims was Plaintiff's last day of employment. The Court is informed that Plaintiff asserted an onset date of August 1, 2000, in her initial disability application and Plaintiff did not timely file an appeal to an adverse administrative decision denying her benefits. The Commissioner argues that under the principles of *res judicata* the claim of Plaintiff is barred by the final adverse administrative decision, which ran through July 14, 2003. The Magistrate Judge recommended the adoption of the Commissioner's legal position on this matter. (Dkt. No. 25 at

20-22).

Administrative *res judicata* is well recognized in Social Security law and is controlled by 20 C.F.R. § 404.957(c)(1), which permits the application of the doctrine to all prior administrative determinations based upon "the same facts and on the same issue or issues." A review of the record fails to disclose what "facts" were before the Agency at the time of the 2003 adverse administrative decision, and on this limited record the Court cannot determine if new and material information was submitted in this application for disability benefits regarding the disputed time period (July 24, 2001- July 14, 2003) that was not considered in the earlier administrative determination. Therefore, if the Commissioner seeks to invoke the doctrine of *res judicata* to limit Plaintiff's recovery in any subsequent decision to the period on and after July 15, 2003, she should submit for the record all information upon which the 2003 adverse administrative decision was based.[3] The Court will then have an adequate record upon which to address the *res judicata* issue.

## Conclusion

Based on the foregoing, the decision of the Commissioner is REVERSED pursuant to Sentence Four of 42 U.S.C. § 405(g) and REMANDED to the Commissioner for further action

---

[3] Plaintiff also argues that since she asserted a different onset date in her later disability application (July 24, 2001) than in her initial disability application (August 1, 2000), this should be treated as a different "issue" for purposes of *res judicata*. The Court finds this argument completely unpersuasive.

consistent with this Order.

    AND IT IS SO ORDERED.

_____<br>
Richard Mark Gergel<br>
United States District Judge

Charleston, South Carolina
August 5, 2013